UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MILLBURN PEAT COMPANY, INC., | ) | |
| and GREEN THUMB OF INDIANA, | ) | |
| L.L.C. | ) | |
|     Debtors. | ) | Appeal from the U.S. Bankruptcy Court |
| | ) | Northern District of Indiana |
| ************************************ | ) | |
| | ) | |
| PVP INDUSTRIES, INC., | ) | |
| | ) | |
|     Appellant, | ) | |
| | ) | |
|         v. | ) | No. 1:07 CV 41 PS |
| | ) | |
| MILLBURN PEAT COMPANY, INC., | ) | |
| | ) | |
|     Appellee. | ) | |
| ************************************ | ) | |
| | ) | |
| PVP INDUSTRIES, INC., | ) | |
| | ) | |
|     Appellant, | ) | |
| | ) | |
|         v. | ) | No. 1:07 CV 42 PS |
| | ) | |
| GREEN THUMB OF INDIANA, L.L.C., | ) | |
| | ) | |
|     Appellee. | ) | |

## OPINION AND ORDER

On November 17, 2006, Bankruptcy Judge Robert Grant confirmed the proposed Chapter

11 plans of Debtors Millburn Peat Company ("Millburn") and Green Thumb of Indiana, L.L.C.

("GT Indiana")[1] over the objection of P.V.P. Industries, Inc., one of Debtors' unsecured creditors. P.V.P. claimed that the plans were not fair and equitable as required by 11 U.S.C. § 1129, because they allowed 1st Source Bank, Debtor's largest creditor, to be paid more than the value of its secured claim.  The court relied on a stipulation between Debtors and P.V.P. that "the Bank has a first priority security interest or mortgage on all of the property of each of the Affiliated Entities" in concluding that the Bank was not overpaid on its secured claims.  On appeal, P.V.P. argues that the court's interpretation of the stipulation was erroneous.  I agree with Judge Grant's ruling, and therefore the opinion of the bankruptcy court is affirmed.

## I. BACKGROUND

On February 4, 2005, 1st Source Bank commenced a receivership action against Millburn, GT Indiana, Green Thumb of Georgia, LLC ("GT Georgia") and Klumb Company (collectively, the "Affiliated Entities").  (DE 11-4 at 1.)[2]  At that time, all four entities were owned by Sam Pitulla.  (*Id*.)  1st Source was Debtors' pre-petition lender and their largest creditor.  (DE 11-6 at 3.)  During the receivership, Pitulla transferred the stock ownership interests of each of the Affiliated Entities to Country Stone and Soil of Indiana, Inc.  (DE 11-4 at 1.)  In August 2005, the Affiliated Entities filed Chapter 11 petitions.  (*Id*.)  Debtors' disclosure statements indicate that 1st Source Bank filed a Proof of Claim totaling $5,903,669.20.  (*Id*. at 2.)

---

[1] This order addresses the appeals from two separate bankruptcy cases, *In the Matter of Millburn Peat Company, Inc.*, Case No. 05-14218, and *In the Matter of Green Thumb of Indiana*, L.L.C., Case No. 05-14171.  Because the two Debtors are affiliated entities and the appeals involve identical legal issues, they are suitable for joint resolution.

[2] Because the exhibits in the Millburn and GT Indiana cases are substantially identical, citations to the record refer to filings in the Millburn case, 1:07-CV-41, unless otherwise identified.

2

On August 30, 2005, the Court granted Debtors' request for the use of cash collateral to facilitate ongoing business operations. (DE 11-8.) The Court's order provided that, "[a]s adequate protection for the use of cash collateral, 1st Source Bank and all other secured creditors with an interest in cash collateral shall have a replacement lien on the Debtor's post-petition assets which comprised the pre-petition cash collateral in the same priority and to the same extent as existed pre-petition." (*Id*. at 2.) At trial, Ronald Bjustrom, the owner of Country Stone and Soil, the Debtors' holding company, testified that Debtors had sought the use of $100,000 of accounts receivables to operate with (Tr. at 32), although the cash collateral order does not specifically reference that amount.

Debtors filed their Chapter 11 plans of reorganization on April 21, 2006. (DE 2-2 at 19.) The plans provided for the cancellation of Class 1A claims, administrative loans that Country Stone and Soil had made to Debtors to allow them to continue to operate, in exchange for Country Stone and Soil's retention of the equity in the two businesses. (DE 11-5 at 5; 1:07cv42, DE 13-5 at 5-6.) The amount of the administrative loan to Millburn was approximately $612,000; the loan to Green Thumb was approximately $270,000. (DE 13-9 at 17.) The Millburn plan proposed to repay 1st Source Bank $2,251,000 via two promissory notes – a $500,000 note secured by Millburn's real estate, and a $1,751,000 note secured by all of its other assets. (DE 11-5 at 6.) The GT Indiana plan proposed to repay the Bank $1,402,000, also in two promissory notes – a $500,000 note secured by GT Indiana's real estate and a $902,000 note secured by all other assets. Thus, together, Millburn and GT Indiana would pay a total of $3,653,000 to 1st Source.[3]

---

[3] Debtors' disclosure statements also indicated that GT Georgia and Klumb would each pay 1st Source $500,000. (DE 11-6 at 7.)

3

After all of the other allowed secured claims and tax claims were counted, the plans provided for a total of only $20,000 to be paid to unsecured creditors. (DE 11-5 at 7; 1:07cv42, DE 13-5 at 6-7.) The classes of unsecured creditors (Class 8 in the Millburn case, Class 5 in the GT Indiana case) voted to reject the plans.

On September 8, 2006, Debtors moved to confirm the plans over the rejection of the class of unsecured creditors. (DE 239; 1:07cv42, DE 162.) On November 15, 2006, Judge Grant held a trial on Debtors' motion to confirm. P.V.P. was the only rejecting creditor that chose to participate in the confirmation trial. Two days prior to trial, Debtors and P.V.P. filed stipulations of fact. (DE 11-4.) Stipulation No. 9 in both cases read as follows:

> As set forth in the Affiliated Entities' Disclosure Statements, (i) the Affiliated Entities were jointly indebted to the Bank in the amount, as of the date of filing, of $5,903,669.20, and (ii) with minimal exceptions, the Bank has a first priority security interest or mortgage on all of the property of each of the Affiliated Entities.

(*Id.* at 2.)

At trial, P.V.P. argued that the Bank was not entitled to all of the Debtors' post-petition assets. Its theory was that 1st Source was undersecured, and therefore, it was not fair and equitable to treat 1st Source as a fully secured creditor having a lien against all the Debtors' assets, when its loans exceeded the pre-petition collateral. However, P.V.P. was in a bind because the Stipulation No. 9 stated that the Bank "has" a first priority security interest in all the Debtors' assets.

First, P.V.P. moved for relief from the stipulation, asking that it be read to state that the Bank "had" a first priority security interest or mortgage on all property at the time the Debtors filed their petitions, not that the Bank "has" such an interest on all post-petition assets. (Tr. at 65.) According to P.V.P., the inclusion of the word "has" was a "typographical error." (*Id.*)

4

P.V.P. further argued that even if the stipulation was read to give the Bank a security interest on all post-petition assets, the stipulation failed to identify the value of the Bank's mortgage on those assets. (*Id*. at 37-38.) P.V.P. also asserted that the plans overvalued the Bank's lien by including post-petition inventory and accounts receivables, when the cash collateral order only granted a replacement lien up to $100,000 for use of cash collateral. (*Id*. at 39-40; 66-67.)

The bankruptcy court determined that there was no basis to relieve P.V.P. from the stipulation giving the Bank a lien on all post-petition assets. (Tr. 119-121.) The court noted that the plans were derived out of a negotiation process – one that P.V.P. did not participate in. (*Id*. at 122-25.) It held that the plans did not discriminate unfairly against the unsecured creditors because the Bank, having a lien on all of the Debtors' assets, was entitled to be treated differently from the unsecured creditors. (*Id*. at 127-130.) It further concluded that the plans were fair and equitable because no junior class of creditors received any property other than Debtors' shareholders, whose retention of equity stakes in the companies satisfied the "new value" exception to the "absolute priority" rule. (*Id*. at 132-39.)

P.V.P. moved to alter or amend the order confirming the plans, arguing that the court misinterpreted Stipulation No. 9 by reading it without reference to the Debtors' disclosure statements. The disclosure statements reference the Debtors' *pre-petition* liens on all assets as well as the *post-petition* lien on cash collateral. P.V.P. asserted that once the stipulation was read in context with the disclosure statement and the cash collateral order, it was clear that the Bank's lien on post-petition assets was limited to $100,000. (DE 4-7.) The bankruptcy court denied the motion on the grounds that P.V.P. had waived this argument by failing to raise it at the confirmation hearing. (DE 4-4 at 2.) The court also found no merit in P.V.P.'s argument that the Bank was receiving more than the full payment of its claim. (*Id*. at 3.)

5

P.V.P. then filed this appeal. The Debtors moved to dismiss the appeal on grounds that substantial consummation of the plans rendered the appeal moot.

## II. DISCUSSION

**A. Motion to Dismiss**

Debtor-Appellees moved to dismiss the appeal on the grounds that the plans have been substantially consummated in the intervening months between confirmation and this appeal, and therefore, the appeal ought to be deemed moot. [DE 14.] Debtors are not, of course, arguing that the appeal is actually moot, but that equitable principles of bankruptcy counsel against disturbing the partially implemented plan. *Matter of UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) (criticizing the term "equitable mootness" as misleading, and characterizing the issue as "whether it is prudent to upset the plan of reorganization at this late date").

The Seventh Circuit has outlined factors to be considered when determining whether a bankruptcy plan ought to be upset on appeal, including the virtue of finality, the passage of time, whether the plan has been substantially consummated, and whether there has been a comprehensive change in circumstances. *In re Specialty Equip. Cos., Inc.*, 3 F.3d 1043, 1048 (7th Cir. 1993). A court should also consider additional elements such as whether the appellants have sought a stay, the nature of the relief sought, and the impact of the relief upon the debtor and third parties. *Id*.

Appellees criticize P.V.P.'s failure to move for a stay pending resolution of this appeal. However, while requesting a stay is one of the factors in the mootness consideration, it is not a prerequisite for modification of a reorganization plan. *In re UNR.,* 20 F.3d at 769. Debtors' plans were confirmed on November 17, 2006, little more than a year ago. Debtors have made certain payments to creditors other than 1st Source, but P.V.P.'s appeal seeks only that payments made to

1st Source in excess of its collateral be redistributed among all unsecured creditors.  Thus, the appeal principally impacts 1st Source, which has been a party to the case since its inception. Payments already made to other parties would not be affected.  Overall, the estates at issue are relatively simple, and the claims against them are relatively few.  *Cf. In re Focus Media, Inc.*, 378 F.3d 916, 923 (9th Cir. 2004) (a court should consider whether a case "presents transactions that are so complex or difficult to unwind" that the doctrine should apply).  Taken together, these factors militate in favor of deciding the appeal on its merits rather than refusing to upset the plans. Debtors' motion to dismiss is denied.

**B. The Appeal**

   **1. Waiver**

At the outset, Debtors assert that P.V.P. waived its argument regarding improper interpretation of the stipulation.  They assert that the Appellant never insisted at trial that 1st Source Bank's lien on post-petition assets is limited to $100,000.  In denying P.V.P.'s motion to amend the confirmation order, the bankruptcy court concluded that P.V.P. did not advance this argument at trial.  (DE 4-4 at 2.)

While P.V.P.'s argument was not as fully developed at trial as it is now, I conclude that it did not waive the argument entirely.  Counsel for PVP, Robert Nicholson, complained at trial that Stipulation No. 9 did not indicate the value of the Bank's mortgage over Debtors' assets.  (Tr. at 37.)  Initially, Nicholson was apparently unaware that the stipulation stated that the Bank "has" a lien on all post-petition assets, and he evidently intended to make the argument that any post-petition interest in cash collateral was limited to the amount of the cash collateral order.  (Tr. at 37-38.)  He argued that if post-petition inventory and accounts receivable were deducted from the value of the Bank's claim, the Bank would be overpaid under the plans.  (Tr. 39-40.)  He later

asserted that P.V.P. should be relieved of the alleged scrivener's error in Stipulation No. 9, because it could not sensibly be read to give the Bank a lien on post-petition assets:

> Judge, if I may, it can't be accurate. As a [matter] of law, it cannot be accurate because, as you well know, the only way to obtain a lien on post-petition material is by Court order. And the Court order granted the Bank a replacement lien to the extent of a hundred thousand dollars. And that's it.

(*Id.* at 66-67.) While these remarks were made in the context of arguing that the stipulation should not be read as written, they provide the same rationale that undergirds P.V.P.'s argument on appeal – that to the extent the Bank's lien covers post-petition cash collateral, the cash collateral order limits the lien to $100,000. While P.V.P. could have made this argument more directly or more artfully, I conclude that it did not waive the issue.

### 2. Merits of the Appeal

Debtors had the burden of proving that the plans satisfied all requirements for confirmation, including that the plans did not unfairly discriminate against the unsecured creditors and were fair and equitable. 11 U.S.C. § 1129(b)(1). On appeal, P.V.P. does not challenge the bankruptcy court's conclusion that the plans did not unfairly discriminate. But P.V.P. argues that the plans were not fair and equitable because, under the plans, the Bank was paid an amount greater than the value of its secured claim. Courts have held that a plan does not meet the "fair and equitable" standard when it pays a creditor more than the value of its claim. *In re Granite Broadcasting Corp.*, 369 B.R.120, 127 (Bankr. S.D.N.Y. 2007); *In re Walat Farms, Inc.*, 70 B.R. 303, 335 (Bankr. E.D. Mich. 1981).

Although P.V.P. argues that the plans pay the Bank more than the value of its secured claim, it stipulated that the Bank has a security interest in the Debtors' post-petition assets. On appeal, P.V.P. doesn't challenge the bankruptcy court's denial of its motion for relief from the

8

stipulation. Instead, P.V.P. attempts to get around the stipulation by urging that the lien on post-petition assets was necessarily limited to $100,000, the value that Debtors sought to borrow under the cash collateral order. Its theory is that Stipulation No. 9 drew from the disclosure statements, which refer to the cash collateral order, and that the cash collateral order was only intended to provide adequate protection for the amount borrowed – $100,000. P.V.P. challenges the bankruptcy court's interpretation of the stipulation, which is a contract between P.V.P. and Debtors. The application of principles of contract interpretation to the facts is a question of law subject to de novo review. *Automation By Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 753 (7th Cir. 2006); *T.B. ex rel. Bruce v. Dobson*, 868 N.E.2d 831, 835 (Ind. Ct. App. 2007).

      Every step of P.V.P.'s analysis is flawed. First, the stipulation reads: "As set forth in the Affiliated Entities' Disclosure Statements, . . . with minimal exceptions, the Bank has a first priority security interest or mortgage on all of the property of each of the Affiliated Entities." (DE 11-4 at 2.) Stipulations are contracts, and are to be interpreted under rules of contract interpretation. *Kochersperger v. State*, 725 N.E.2d 918, 925 (Ind. Ct. App. 2000). One of the most basic rules of contract interpretation is that courts are not to look outside the four corners of a contract unless the language of the contract is ambiguous. *Reuille v. E.E. Brandenberger Const., Inc.*, 873 N.E.2d 116, 119 (Ind. Ct. App. 2007) (citing *Abbey Villas Dev. Corp. v. Site Contractors, Inc.*, 716 N.E.2d 91, 99-100 (Ind. Ct. App. 1999)). Here, while the stipulation refers to the disclosure statements, the plain language of the stipulation sets forth the parties' agreement that 1st Source has a first priority security interest in "all" of the property of each of the Affiliated Entities. The "as set forth" language does not incorporate the disclosure statements by reference – rather, it simply indicates that the stipulation purports to restate what is contained in the disclosure statement. *Cf. Milwaukee Police Ass'n v. Hegerty*, 693 N.W.2d 738 (Wis. 2005)

9

(collective bargaining agreement subordinated to city ordinances where agreement provided that, in the event that the agreement conflicted with legislative authority "as more fully set forth" in city ordinances, agreement would be subordinate to the ordinances).  Thus, there is no reason to look back to the disclosure statements to interpret the meaning of the contract.

But even if this Court were to look to the disclosure statements and the cash collateral order for help in interpreting the stipulation, they do not support P.V.P.'s interpretation.  The disclosure statements describe the process by which 1st Source obtained its replacement lien:

> At the commencement of the case, Debtor filed an Emergency Motion for Use of Cash Collateral seeking the authority to use cash collateral consisting of bank accounts, accounts receivable, and proceeds from inventory for continued operation and maintenance of the business.  1st Source Bank initially objected to this Motion, however, following negotiation and discussion between the parties, an agreement was entered into which was approved by the Court that authorized Debtor's use of cash collateral for a limited period of time and granting replacement liens to 1st Source Bank to the same extent and same priority as existed pre-petition as adequate protection for Debtor's use of cash collateral.

(DE 11-6 at 5.)  The cash collateral order itself reads:  "As adequate protection for the use of cash collateral, 1st Source Bank and all other secured creditors with an interest in cash collateral shall have a replacement lien on the Debtor's post-petition assets which comprised the pre-petition cash collateral in the same priority and to the same extent as existed pre-petition."  (DE 11-8 at 2.)  Nowhere in the disclosure statement or the cash collateral order does it appear that the replacement lien is capped at $100,000.  Rather, both documents indicate that the replacement lien exists in the same priority and to the same extent as existed pre-petition.

P.V.P. argues, however, that because the cash collateral order was intended to provide 1st Source with "adequate protection" for the Debtors' use of cash collateral, the replacement lien was limited to the amount of cash collateral that the Debtors' intended to use.  Indeed, 11 U.S.C. § 361(2) indicates that adequate protection may be provided by granting an entity "an additional

10

or replacement lien *to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property*."  11 U.S.C. § 361(2) (emphasis added). Because one of Debtors' representatives testified at the confirmation hearing that the Debtors only asked for $100,000 in accounts receivables to operate with (Tr. at 32), P.V.P. concludes that the replacement lien should have been limited to $100,000.  P.V.P. argues that giving 1st Source a blanket lien over the full value of all post-petition assets is to impermissibly "cross-collateralize" its entire pre-petition debt with all of its post-petition assets.  *See Bland v. Farmworker Creds.*, 308 B.R. 109 (Bankr. S.D. Ga. 2003) ("The wholesale cross-collateralization of prepetition debt with postpetition assets can effect a massive preference in favor of the prepetition creditor if the prepetition creditor is undercollateralized."); *In re Saybrook Mfg. Co.*, 963 F.2d 1490, 1494-95 (11th Cir. 1992) (holding that 11 U.S.C. § 364(c) and (d), which provide for extensions of new credit, do not authorize the granting of liens to secure pre-petition loans).

But P.V.P.'s argument fails again.  Even if the Court were to assume that the replacement lien impermissibly cross-collateralized the Bank's debt, this would be a flaw in the cash collateral order, not in the stipulation, for the cash collateral order purports to give 1st Source a replacement lien "in the same priority and to the same extent as existed pre-petition," and says nothing about a $100,000 ceiling.  The stipulation, in turn, merely summarizes the Bank's interest in Debtors' post-petition assets.  P.V.P. had numerous opportunities to challenge the cash collateral order, but failed to do so.  Creditors were given notice of the August 29, 2005 hearing on Debtors' emergency motion to use cash collateral, yet 1st Source was the only creditor who objected. Although the August 30, 2005 cash collateral order authorized Debtors' use of cash collateral, it continued the hearing to a final hearing date set for September 26, 2005.  The order specifically directed that all creditors and parties in interest should receive notice of September 26 hearing.

11

This gave creditors nearly a month to object to the order, yet neither P.V.P. nor any other creditor came forward.

Not only did P.V.P. fail to object to the cash collateral order at the time it was entered, but it also failed to raise the argument at the confirmation hearing or on appeal. At every turn, P.V.P.'s objection has been to the stipulation – not the cash collateral order. P.V.P.'s position is that "the terms of the Cash Collateral Order are entirely consistent with the Bankruptcy Code, and limited the Bank's lien on Debtor's post-petition assets to that necessary to provide adequate protection for the Debtor's use of the Bank's cash collateral." (Reply at 5.) This is incorrect. The order does not limit the Bank's lien to the extent of the use of cash collateral – rather, it provided a new lien "to the same extent as existed pre-petition." The stipulation and the disclosure statements merely track that language. Because P.V.P. has never argued that the cash collateral order, as written, impermissibly provided for cross-collateralization of the Bank's pre-petition security interests, any such argument is waived.

In its final argument, P.V.P. maintains that even if the post-petition lien is interpreted to cover all post-petition assets, the Bank is still undersecured by more than $600,000. P.V.P.'s valuation of Debtors' assets excludes the companies' going-concern value. This line of argument takes issue with the bankruptcy court's fact-finding, which I review for clear error. *In re Smith*, 286 F.3d 461, 464-65 (7th Cir. 2002). The bankruptcy court found that the Bank's lien on all assets included contract rights, goodwill, and other items that counsel for P.V.P. did not include in his calculations. (Tr. at 130-31.) The court concluded the Debtors' going-concern value (listed in the disclosure statements as $500,000 for Millburn, and $250,000 for GT Indiana (DE 11-6 at 12; 1:07cv42, 13-6 at 12)), booked as goodwill, was part of the post-petition security. (Tr. at 131.) Taking the going-concern value along with the rest of the Bank's collateral package, the

court concluded "that there is an excellent basis for believing that the Bank is fully secured . . . ." (*Id*.)

P.V.P. does not offer any reason why Debtors' going-concern value ought not to have been counted, other than to refer back to its argument that the Bank did not have a lien on all post-petition assets. As discussed above, I find no merit in that argument. As such, there is no basis to conclude that Debtors failed to meet their burden of proof that the plans satisfied 11 U.S.C. § 1129.

### III. CONCLUSION

For the foregoing reasons, the bankruptcy court's November 17, 2006 order confirming the plans is **AFFIRMED**. The Clerk is hereby **ORDERED** to enter judgment in favor of Appellees Millburn Peat Company, Inc. and Green Thumb of Indiana, L.L.C.

**SO ORDERED.**

ENTERED: February 15, 2008

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT
